petitioners. This is an appeal of two asylum claims, one by a mother and one by her daughter. It's sort of difficult to address it all because they're different claims. I'll start with the daughter's claims. Andrea Wences came to the United States, presented herself, and asked for asylum because of abuse she had suffered at the hands of two former partners. At the time, there was a precedent decision called Matter of ARCG that talked about how people with domestic violence can get asylum in the United States. That may be the 28-J letter I filed this morning. Some of this law is evolving as we speak. After a briefing in this case was completed, the Attorney General issued a decision called Matter of AB that purported to change the asylum law, but then the decision that came out that I just became aware of in this Grace case basically says the Attorney General has now conceded that most of Matter of AB is dicta and that it didn't change the law. What we're left with, I think, is Matter of ARCG is no longer the law, and the main criticism of it was that it had relied on a stipulation. But beyond that criticism, the teeth of Matter of ARCG are still there. We still use the same tools to determine what is a particular social group. There are problems with the way that Andrea's First, the agency agreed that her first partner had persecuted her. The things he had done to her was persecution. But the agency never applied the regulatory presumption that's supposed to arise when you've been persecuted in the past that it's presumed you'll be persecuted in the future. That never occurs here. Primarily, the board and the immigration judge addressed this question about was she able to leave because the group in Matter of ARCG had been defined as married women in El Salvador who were unable to leave. The focus was on inability to leave. Our main complaint is that inability to leave, taken to its most literal form, would never apply to anyone because the fact that you're here means you left. And as we read the board's decision, that seems to be what they're saying. Well, you were able to get away, so it's not that you were unable to leave. The concern is she was able to get away at considerable risk, and it wasn't with his agreement. He had brought a gun to her house and threatened to kill her and then had continued to harass or threaten her family members since she left Mexico. Isn't that sort of the gravamen of the board decision, though? I understand your argument, and the language in the decision is arguably kind of loose, that you could read it to say anybody who left obviously isn't somebody who can't leave. But I think what they really were saying, it wasn't that hard for her to leave, therefore she didn't fall into the group of domestic partners who can't leave their abusive spouse. I think you're right. I think that's what they were getting at. They have a paragraph on relocation, for example. They do, and I'd like to talk about that as a separate issue. But on the ability to leave, I do think the facts here are important because she was found to be credible. The gentleman came to her house with a gun and held them at gunpoint the whole evening. Now the fact that he left in the morning didn't mean he assented to them leaving. He came back after they had left and I believe threatened her uncle. So to address Judge Benton's question about relocation, I do think the agency's findings aren't complete because there are things we know in this record that aren't addressed. One of them is Jose, the abuser, is a well-known narco trafficker and part of a cartel. The idea that she could leave and, I guess, relocate to another part of Mexico, I think, would require a finding that Jose can't find her there. But the agency doesn't make that finding. Well, there's a relocation and a get-back-together and a leaving, right? With Jose? For the first abuser, she relocated because she had been in Tijuana. She went back home to her mother. I agree that for the first abuser, she was able to relocate. In that instance, our concern is with the regulatory presumption, that she might not necessarily need to prove she's likely to be persecuted in the future. For the second abuser, she didn't relocate and he's the one that was alleged to have been employed by the cartel and said, I can have my cartel find you. I'll call in a favor if you leave. The relocation analysis by the board is a single sentence at page five of the record. It doesn't do the analysis or address this particular fact, the fact that Jose was part of a narco-trafficking group that had a reach that could find her. I want to use the rest of my time, if I can, on Victorina's asylum claim because it's a little bit different. She's afraid of the same man, but the reasoning is different. She is not a victim of domestic violence who can't leave the relationship. Her group, the particular social group, was the family of Andrea, the nuclear family, which this court and the board have addressed as being a particular social group. The board addressed this by saying, we don't think your family relationship was the reason that he went after you. That's at page five of the record. But the board doesn't exactly say why. The board says they think he targeted Victorina because she just happened to be in the house. But that's not a fact finding that the judge made, and there's no evidence that I know of that's in the record, any of the witnesses testified that that's what happened. What's the citation to IJ 22 with the quotes around it for, has she happened to be in the return? Perhaps that is a quote from the IJ. That's not in my notes. Okay, go ahead. It's page five of the record. I'm following you. Go ahead. But I would note that in closing, the trial attorney agreed that Jose was going to continue to come after Victorina if she got deported. That's at page 195 and 196 of the record. That's a concession by the prosecutor that Victorina was being targeted for a reason other than you just happened to be in a house on a particular day. And missing from the concession. We did brief it at the board. And again, that's in the trial transcript at the record at page 195 and 196. And then finally, on the issue of future persecution for Victorina, the board agreed in its decision that there was limited evidence she would be persecuted. That's at page five. It might be that the board was referring to that concession. That's the limited evidence they were talking about. But it's not clear to me why that doesn't meet her burden of proof. She doesn't need to show clear and convincing evidence. Limiting evidence might not be enough to show she's likely to be persecuted. So for these reasons, we think the court should reverse and remand to the board. I have a question about the two persecutors. Because Andrea has, there's two. And you've called them one and two. And I was using their first names. So I was having a little trouble following which one was which. It seemed to me that it was, I don't know if this is your one or two, but it was Diego that the board, that the IJ actually found that there was past persecution, am I right? Yes, that's right. Okay. But it's Jose that you're arguing that she is unable to leave? I argued in our briefing that she was unable to leave either of them. She did leave Diego, but not, I mean, she left with none of her documents. That seemed a little dicier than the Jose leaving. Right. So she had to get police, I think, to take her to a bus station. They didn't do anything about the fact that she had been brutalized, but they took her to a bus station. And then, yes, she was able to get away, but at significant risk. So, and maybe there's no real good answer to this, but how do you, how do we look at both of these relationships in the context of her claim? It seems to me to be a combination. If you look at, if you combine Jose and Diego into one person, it seemed to me you've got, I don't know if you'd call it a stronger case, but a more articulable case? Yeah. So how do, is there, or do we look at it any differently? Because there are two people who have, that the board has, or the IJ has found to be different categories of players here? I think there are two ways it affects it. One of them, the immigration judge thought the fact that she had gotten away from the first person meant that was no longer something And you mean Jose? I meant, I'm sorry, Diego, the first abuser in Tijuana. But I think it also affects the relocation analysis, because the agency said, look, you moved to Tijuana before, you could move to Tijuana again. But when she moved to Tijuana before, this guy Diego brutalized her and is still there. And so I think the fact, I think it adds to the argument that she can't relocate because she can't move to Tijuana. But our argument is, if you make a finding about persecution, that there has been past persecution, then the regulations require additional, there's a presumption of future persecution. We need to talk about why, why were you persecuted? Was it because you were a member of a particular social group? We think it's the same social group that was identified in ARCG. But I think it is a more compelling claim because it's happened to her twice and that she's had to flee for her life from both partners. Thank you, Judge Kelly. Thank you. Ms. Greer. Good morning. May it please the court. I'm Christina Greer on behalf of the attorney general. Your honors, the record in this case does not compel the conclusion that petitioners qualify for asylum. Asylum is not available to cure all ills or provide relief to all who experience harm. It's a limited form of relief available only to those who establish that they're refugees. And to be a refugee, it's a very narrow category. It's someone who has been or will be subjected to harm rising to the level of persecution, but that harm must be on account of one of the five protected grounds of race, religion, nationality, political opinion, or membership in a particular social group. Both Ms. Godinez and Ms. Alarcon have experienced serious harm, but the record does not compel the conclusion that that harm was on account of a protected ground. Specifically, the record does not compel the conclusion that Ms. Godinez is a member of her asserted particular social group of women in abusive membership in a group of Ms. Godinez's family members. Those are conclusions that are dispositive of both of their claims. Let me ask this. Prior to the attorney general's decision in AB, could a person who is in an abusive relationship be considered a member of a particular social group, taking out the inability to leave? You're just in a very bad, abusive relationship. Can that constitute a particular social group prior to AB? Well, the question with unable to leave, in matter of ARCG, the board stated that the inability to leave the relationship is what makes the relationship immutable. So for there to be a cognizable social group, it must be immutable, particular, and socially distinct. And for the immutability requirement, marriage isn't necessarily something that people can't leave, but perhaps in some societies it is something that's immutable and can't be changed because society and cultural norms prevent someone from leaving and make that relationship immutable. And so that's where the inability to leave language came from, this idea of immutability, that one can't change the fact that they're in a relationship because of societal context that does not allow them to leave that relationship. And so here, Ms. Godinez was able to leave, but also, as the board noted, she did not have any requirements or societal norms that prevented her from changing her relationship status with either Diego or Jose. Well, what is it that Attorney General Sessions purported to do when he issued AB? What is it that was going to change? In matter of AB, the problem with ARCG was that it was entirely based on concessions by the parties. And so in AB, the Attorney General said, no, board, you have to show your work. You have to go through each of these requirements in each case and show that they are established. And as I was one of the counsels on, or I am one of the counsels on grace, and one of the arguments that we went through there, we discussed how the problem that arose for a matter of ARCG is that it essentially established the group, and the group no longer became a question. It was treated as if it were a group as a matter of law, when it's actually a factual question that must be determined in each individual case. And so that's what the Attorney General said in AB, is that the board and the immigration judge have to do their work. They have to actually analyze whether this is a group within that societal context. So is the department's position that it did not change the law, it was only a procedural ruling? Yes. Okay. It did not change the law. It just said, board, you have to do your work. You can't make legal determinations that then, especially in a precedent decision, based on the concessions of parties. The board must actually do the work. And that doesn't affect this case, neither AB nor grace does, because Ms. Godinez did not establish, or the record doesn't compel the conclusion that she's a member of her group. And so it's a different question than cognizability, and we're not arguing that AB applies here, or anything of that nature. Just that Ms. Godinez did not establish that she's a member of her group, because she was able to first leave Jose in 2011 without issue. In fact, they had no further contact, and he even refused to take her phone calls. Then when she left and came into a relationship with Diego, she was able to leave that relationship in 2013, and according to opposing counsel, with the assistance of the police, to at least leave. Now, again, she got into another relationship consensually with Jose in 2015, or in, I believe, 2015. Yes, was when they moved back in together. And then in November 2015, she told him to leave. There was the terrible event with him coming back with the gun. But then he did leave, and for the next few weeks that she remained in Mexico, they had no further contact, and indeed have only had one Facebook friend request since. And that, coupled with the fact that there's no evidence of societal or social norms that have kept her in either of those relationships, means she didn't establish that she was unable to leave those relationships. And second, the record supports the conclusion that the harm that Ms. Alarcon experienced and fears was not on account of her familial relationship with Ms. Godinez, or at least that the record doesn't compel that conclusion. Nexus is a question of motive, whether Jose's motive was to harm Ms. Alarcon because of her relationship to Ms. Godinez. And the record doesn't compel that conclusion. I thought that the record showed that he came into the family home and was basically threatening folks in Andrea's family, saying, I'm going to do harm to the children, all but the one who is mine. It seemed to me that there was some indication that he was targeting Andrea's family in that incident. And, well, I have two responses to that. The first is that there's no, not necessarily that he was targeting her family because they are her family versus because they were there. If there had been a friend at the house, he would have, the record doesn't compel the conclusion that he would not have targeted the friend as well. It was the people that were in the house, and that was the factual finding made by the immigration judge. And so that doesn't necessarily mean that he was threatening Ms. Alarcon because she is Ms. Godinez's mother. So there's a difference between being put in the place where one is being threatened because of the familial relationship versus the persecutor targeting and having a motive, a persecutory motive to target that person because of that familial relationship. And the evidence doesn't demonstrate that he has or will target Ms. Alarcon because she is Ms. Godinez's mother. In fact, the evidence that Kishner's point to, the threat to Ms. Alarcon's brother, also don't support the idea that he has a persecutory motive against the family. As the testimony stated that he threatened him for trying to obtain a copy of the police report and for quote, interfering, it doesn't state that he's threatening him because he's targeting Ms. Godinez's family members. And so also, ultimately, even if two conclusions can be drawn based on the evidence and the record, the evidence must compel the facts or compel that the facts are how the petitioners want them to be seen. And here the facts or the evidence of record does not compel the able to leave her relationship and also does not compel the conclusion that Ms. Alarcon was or will be targeted by Jose on account of her familial relationship with Ms. Godinez. So unless there are any additional questions, I will briefly conclude. Thank you for your argument, Ms. Tropic. Thank you. Two things. To respond to Judge Malloy's question about could you just be an abused person and is the inability to leave a necessary condition, it's never been explained why that's a necessary condition. And there's one good example. In this court, this court made a decision in the case of Ngengwe, it's N-G-E-N-G-W-E, it's not in my brief, versus Holder, that Holders were a particular social group. That was the court's holding. The court didn't require them to show they couldn't leave the family or that they had some sort of necessary tie. So that's I think a good reason, a good case in this circuit where the ability to leave is not necessarily required. The last point I wanted to make is about if Victorina was only targeted because she was in the house, why did the government agree that when she gets deported, she was likely going to be targeted again by Jose? That's at page 195 of the record. The agency has never quite explained why they conceded that and I think it goes a long way to refute the argument by the immigration judge and the board that she was only targeted because she just happened to be in the house. Thank you. Thank you both for your argument. Case number 18-1060 is submitted for decision.